RECEIVED
AUG 14 2026
PRO SE OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JASON WIMBERLY,
Plaintiff,

CV 26- 4980

v. Civil Action No. ______________

ATLANTIC DIALYSIS MANAGEMENT SERVICES, LLC,

KAMINSKY, M.J.

Defendant.

**COMPLAINT**

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1. Plaintiff Jason Wimberly is a patient with End Stage Renal Disease ("ESRD") who receives life-sustaining hemodialysis four times weekly at a dialysis center managed by Defendant Atlantic Dialysis Management Services, LLC.

2. This action arises from Defendant's demand for payment of an amount Plaintiff does not lawfully owe, and from Defendant's persistent refusal — sustained over approximately three years — to communicate with Plaintiff in writing notwithstanding his repeated, documented requests that they do so as an accommodation of his disabilities. At the outset, and in the interest of transparency, Plaintiff states that he has filed suit against

Defendant twice before and that both cases remain pending. Both were filed in the Southern District of New York. One is on appeal before the Second Circuit, *Wimberly v. Atlantic Dialysis*, No. 25-1527. The other is a district court action that also includes a civil RICO claim against Defendant, its counsel, and its employees, *Wimberly v. Atlantic Dialysis Mgmt. Servs., LLC*, No. 26-cv-5949 (MKV), premised in part on demonstrably false statements and on alleged wire and mail fraud, witness tampering, and obstruction of justice as predicate acts and thereby seeks amongst other things accountability for Defendant's and their Counsel's knowingly false statements and as a result obtaining a favorable judgment by fraud upon the Court proceedings overseen by Judge Oekten. See Exhibits A and A-1. The claims asserted here arise from conduct occurring after those actions were commenced and are not duplicative of the claims asserted in them.

3. Defendant Atlantic Dialysis Management Services, LLC ("ADMS") is a debt collector subject to the Fair Debt Collection Practices Act. ADMS states on its own website that it "performs billing and collections" for "[e]ach chronic dialysis center" in its network — a network ADMS advertises as comprising thirteen clinics. See Exhibit B. Those clinics are operated under at least eight separate Article 28 operating certificates issued to at least eight distinct licensed operators, several of which ADMS has described as joint ventures.

4. Sometime in late March 2026, Plaintiff's Medicaid coverage lapsed because he did not timely recertify. Plaintiff informed Defendant and asked Defendant for help arranging transportation to a Medicaid office in order to recertify. Plaintiff is dually eligible for Medicare and Medicaid. Although Plaintiff remained substantively eligible for Medicaid, he was administratively disenrolled solely for failure to recertify — not for ineligibility. On April 9, 2026, ADMS's own Licensed Master Social Worker, of her own accord,

wrote to Plaintiff — copying ADMS's principal, J.G. Bhat, M.D. — that Plaintiff had "successfully been reinstated with your Medicaid insurance which is now active." See Exhibit C.

5. Notwithstanding that written representation by its own staff, Defendant thereafter issued statements billing Plaintiff personally, as "SELF PAY," for the entire April 2026 service period, and has continued to issue such statements monthly. New York Medicaid guidelines prohibit billing a patient where, among other things, a provider initially confirms eligibility and later determines that confirmation to have been incorrect.

6. When Plaintiff twice raised the possibility of a billing mistake and asked in writing for a written explanation, Defendant responded with a telephone number. Plaintiff explained in a written response that treatment-related and other difficulties made a telephone call difficult, and asked again for a response by email. Defendant then telephoned Plaintiff twelve minutes after he left the dialysis chair, while he was in a vehicle returning home from treatment, suffering the post-treatment symptoms that were the stated basis for his accommodation request.

7. Plaintiff seeks statutory and actual damages, declaratory and injunctive relief, and costs.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d), and over the Rehabilitation Act and Americans with Disabilities Act claims under 28 U.S.C. §§ 1331 and 1343.

9. This Court has supplemental jurisdiction over Plaintiff's state and municipal law claims under 28 U.S.C. § 1367(a), as they form part of the same case or controversy.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District. Defendant is a limited liability company whose administrative offices and principal place of business are in College Point, Queens County, and it is therefore subject to personal jurisdiction here with respect to this action. 28 U.S.C. § 1391(c)(2), (d).

11. Venue is independently proper under 28 U.S.C. § 1391(b)(2) because a substantial part — indeed, substantially all — of the events giving rise to these claims occurred in Queens County. The billing statements at issue were generated in College Point; the demand for payment directs remittance to College Point; the telephone call of August 6, 2026 originated from a College Point telephone number; and the ADMS personnel who administer the billing operation, respond to patient inquiries, and made the decisions challenged here work in College Point. Venue is further proper because the dialysis clinic at which Plaintiff is treated, although physically located in Manhattan, holds no independent operating certificate under Article 28 of the New York Public Health Law and instead operates as an extension clinic of Ridgewood Dialysis Center, Inc., which is likewise located in Queens County.

12. Contemporaneously with the filing of this Complaint, Plaintiff has served a copy upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York pursuant to N.Y.C. Admin. Code § 8-502(c).

## PARTIES

13. Plaintiff Jason Wimberly resides at 231 East 117th Street, New York, New York 10035. He is a "consumer" within the meaning of 15 U.S.C. § 1692a(3) and a person with a

disability within the meaning of 42 U.S.C. § 12102, 29 U.S.C. § 705(20), N.Y. Exec. Law § 292(21), and N.Y.C. Admin. Code § 8-102.

14. Defendant Atlantic Dialysis Management Services, LLC is a New York limited liability company. Its administrative offices and principal place of business are located at 23-14 College Point Boulevard, College Point, New York 11356, in Queens County. ADMS maintains no administrative office outside College Point. Although certain ADMS personnel use the street addresses of the clinics they serve in their email signature blocks, ADMS itself does not operate an office at any such address; the clinics are separately licensed facilities that contract with ADMS for administrative and operational support.

15. Non-party Ridgewood Dialysis Center, Inc. is the licensed operator of record under New York State Department of Health operating certificate 7003241R, which encompasses as an extension clinic the facility at which Plaintiff receives treatment. Ridgewood Dialysis Center, Inc. is located in Queens County. The debts ADMS demanded from Plaintiff are owed, if at all, to Ridgewood Dialysis Center, Inc. and not to ADMS.

## FACTUAL ALLEGATIONS

### A. <u>Plaintiff's Treatment and Coverage</u>

16. Plaintiff has ESRD and requires hemodialysis four times per week to remain alive.

17. Plaintiff receives that treatment at an ADMS-managed facility in Manhattan.

18. That center is not a separately licensed facility. It operates as an extension clinic under an operating certificate issued to a different ADMS-managed facility.

19. At all relevant times Plaintiff was enrolled in a Medicare Advantage plan and was also eligible for New York Medicaid as a secondary payer.

20. Medicaid pays the beneficiary-responsibility portion — coinsurance and copayment — remaining after Medicare adjudication.

**B. <u>The April 2026 Coverage Interruption and ADMS's Written Representation</u>**

21. Plaintiff's Medicaid coverage lapsed on or about April 1, 2026, for failure to recertify.

22. On April 7, 2026, Plaintiff requested assistance from ADMS staff with Medicaid renewal and related referrals.

23. On April 9, 2026, Ann Marie Martinez, LMSW, of Atlantic Dialysis Management Services, LLC, wrote to Plaintiff by email, copying Holly Koncicki, M.D., JaVita Banks [ADMS], J.G. Bhat, M.D. [ADMS], Patrick Acosta, and Daniel Stalbow, M.D., stating: "You have successfully been reinstated with your Medicaid insurance which is now active." See Exhibit C.

24. Plaintiff reasonably relied on that written representation by Defendant's own staff.

25. Plaintiff attended dialysis treatments four times weekly throughout April 2026, and continues to do so at the same frequency. Plaintiff also received a statement for May 2026.

26. Sometime in April or May 2026, Plaintiff recertified for Medicaid.

C. **The Statements**

27. Defendant issued a statement dated June 30, 2026, bearing on its letterhead a reference to the clinic and to "ATLANTIC DIALYSIS MANAGEMENT SERVIC[ES], 23-14 COLLEGE POINT BLVD, COLLEGE POINT, NY 11356."

28. The June statement identifies Plaintiff's account by a number bearing the prefix "TC" and a claim number; the service period as 04/01/26 to 04/30/26; the "Service Rendered By" entity as "CPK"; the insurer as "SELF PAY – All"; total charges of $40,241.68; payments of $5,743.26; adjustments of $33,033.40; and a balance due of $1,465.02. See Exhibit D.

29. The statement instructs: "Please pay this amount," and directs remittance to the College Point address — ADMS's address.

30. Defendant issued a further statement adding a balance for June 2026.

31. The statements bill the entire April 2026 service period as a single undifferentiated line item at "SELF PAY," without regard to whether Plaintiff was a Medicaid beneficiary on any date of service within that period.

32. The June 30, 2026 statement was the first communication ADMS directed to Plaintiff seeking payment from him personally for the April 2026 service period. Before that date, no communication from ADMS had asserted that Plaintiff owed any amount for those services in his individual capacity.

33. Neither the June 30, 2026 statement nor any communication ADMS sent within five days thereafter advised Plaintiff of the amount of the debt and the name of the creditor to whom it was owed; that unless he disputed the debt within thirty days it would be

assumed valid; that if he disputed the debt in writing ADMS would obtain verification and mail it to him; or that upon written request ADMS would provide the name and address of the original creditor. ADMS has never sent Plaintiff any such notice.

34. Neither the June 30, 2026 statement nor any subsequent statement disclosed that it was sent by a debt collector, that ADMS was attempting to collect a debt, or that information obtained would be used for that purpose.

**D. <u>Defendant's Confirmation That the Balance Is Attributable Solely to the Medicaid Interruption</u>**

35. On August 6, 2026, an ADMS representative telephoned Plaintiff and stated, in substance: that Medicare Advantage had paid approximately $5,000; that the outstanding balance represents the coinsurance portion ordinarily paid by Medicaid as secondary payer; that the balance exists solely because "the Medicaid was off"; that Plaintiff's coverage was in force "up to March" and inactive from April forward; and that Plaintiff should seek to have Medicaid "activated to April."

36. The representative further stated: "we're legally obligated to send you the bill."

37. No provider is legally obligated to bill a patient. To the contrary, a provider enrolled in the New York Medicaid program agrees, as a condition of enrollment, "to accept payment from the medical assistance program as payment in full for all care, services and supplies billed under the program," 18 N.Y.C.R.R. § 504.3(c), and "to comply with the rules, regulations and official directives of the department," id. § 504.3(i). Consistent with those obligations, the New York State Medicaid Update instructs that a provider may not seek payment from a beneficiary beyond applicable copayments — including

where the provider fails to submit a timely claim, and where a submitted claim is denied for any reason other than the patient's ineligibility on the date of service. See Exhibit E.

38. New York regulation designates the conduct at issue an "unacceptable practice" constituting fraud or abuse. It is an unacceptable practice to engage in "[c]lient deception," defined as "[d]eceiving, misleading or threatening a client, or charging or agreeing to charge or collect any fee in excess of the maximum fee, rate or schedule amount from a client." 18 N.Y.C.R.R. § 515.2(b)(9). It is likewise an unacceptable practice to "[s]eek[] or accept[] any gift, money, donation or other consideration in addition to the amount paid or payable under the program for any medical care, services or supplies for which a claim is made." Id. § 515.2(b)(8). The regulation reaches the act of seeking payment; it does not require that the payment be obtained.

39. An unacceptable practice further includes any conduct "contrary to . . . the official rules and regulations of the department" and "the published fees, rates, claiming instructions or procedures of the department." 18 N.Y.C.R.R. § 515.2(a)(1)–(2). The Medicaid Update is such an official directive.

40. ADMS's own Licensed Master Social Worker informed Plaintiff in writing that his Medicaid coverage was active. ADMS thereafter charged Plaintiff, and continues to charge him, the coinsurance amount the Medicaid program would have paid. That is client deception within the meaning of § 515.2(b)(9) and the seeking of additional payment within the meaning of § 515.2(b)(8).

41. On information and belief, ADMS did not verify Plaintiff's Medicaid eligibility through the electronic Medicaid eligibility verification system for the April 2026 dates of service before designating those services "SELF PAY" and billing them to Plaintiff. Failure to

use the required eligibility verification procedures is itself an unacceptable practice. 18 N.Y.C.R.R. § 515.2(b)(16); see id. Part 514.

42. The provider enrolled in the Medicaid program with respect to the services at issue is Ridgewood Dialysis Center, Inc., the licensed operator. ADMS acts as its agent in billing and collecting. An agent may not lawfully collect from a patient an amount its principal is prohibited from collecting.

43. Statements continue to issue and the balance continues to accrue at approximately $1,465 per month.

44. During the August 6, 2026 telephone call, ADMS's representative did not disclose that ADMS is a debt collector, that the call was an attempt to collect a debt, or that any information obtained would be used for that purpose. He did not advise Plaintiff of his right to dispute the debt or to obtain verification of it. He instead asked Plaintiff to write a note on the payment stub of his next statement and return it to the College Point address.

**E. <u>Plaintiff's Disabilities and Defendant's Knowledge of Them</u>**

45. In addition to ESRD, Plaintiff has been diagnosed with other conditions that are exacerbated by stress.

46. Defendant is aware of each of these conditions. They appear in the medical record Defendant itself maintains, and Plaintiff has stated them to Defendant's clinical and administrative staff.

47. These conditions impair Plaintiff's ability to concentrate outside of dialysis treatment, and impair it substantially more during and immediately following treatment.

48. These conditions further render Plaintiff physiologically vulnerable to stress. Stressful conversations can trigger, and have triggered, Plaintiff's symptoms — including but not limited to acute elevations in blood pressure.

49. Proof of those elevations is in Defendant's own records. The dialysis machine measures and records the blood pressure of Plaintiff and of every other patient as a matter of course throughout each treatment.

50. Both nurses and dialysis technicians employed at the facility have observed first-hand that Plaintiff's blood pressure rises by as much as forty points during and after treatments disrupted by Defendant's administrative staff.

**F. Plaintiff's Requests for Written Communication**

51. Over the past approximately three years, Plaintiff has repeatedly requested that Defendant respond to his inquiries and to his requests for investigation in writing.

52. Federal law entitles Plaintiff to make that request. The Conditions for Coverage for End-Stage Renal Disease Facilities provide that "[t]he patient has the right to — . . . [r]eceive all information in a way that he or she can understand," 42 C.F.R. § 494.70(a)(2), and to "[b]e informed about . . . charges for items and services not covered under Medicare," id. § 494.70(a)(11). Defendant is further required to maintain, and to respond to, an internal grievance process. 42 C.F.R. § 494.180.

53. New York law is to the same effect. The Patients' Bill of Rights for Diagnostic and Treatment Centers, published by the New York State Department of Health and required to be furnished and posted at Defendant's facility, provides that a patient has the right to "[e]xpress complaints about the care and services provided and to have the center

investigate such complaints," and that "[t]he center is **responsible for providing the patient or his/her designee with a written response within 30 days if requested by the patient** indicating the findings of the investigation." Patients' Bill of Rights for Diagnostic & Treatment Centers (Clinics), No. 12 (emphasis added). See Exhibit F.

54. The same Bill of Rights provides that a patient has the right to be "treated with consideration, respect and dignity **including privacy in treatment**" (No. 2); to obtain complete and current information "in terms the patient can be reasonably expected to understand" (No. 7); to "[v]oice grievances and recommend changes in policies and services to the center's staff, the operator and the New York State Department of Health **without fear of reprisal**" (No. 11); and to "[r]eceive an itemized copy of his/her account statement, upon request" (No. 6). (emphasis added).

55. Each of Plaintiff's requests for a written response to an inquiry or investigation was therefore an exercise of a right the State of New York had already conferred on him and that Defendant was already obligated to honor — independent of, and in addition to, Defendant's obligation to accommodate his disabilities.

56. Defendant maintains the capacity to communicate with patients in writing. It is required by New York law to provide a written response, within thirty days, to any patient who requests one following a complaint. Defendant corresponds with Plaintiff in writing routinely in other contexts, including by email. Responding to Plaintiff's inquiries in writing would therefore have required no new system, no additional staff, no training, and no expenditure.

57. Notwithstanding those requests, Defendant's administrative staff have responded to Plaintiff's requests for information and for investigation — to the extent they responded

at all — by approaching Plaintiff at his dialysis chair during treatment. On other occasions they have initiated their own inquiries of Plaintiff in the same manner.

58. In doing so, Defendant's staff have woken Plaintiff from sleep during treatment, and have required him to conduct administrative conversations over the background alarms of his own and other patients' dialysis machines.

59. Plaintiff repeatedly asked Defendant's staff for space, to speak at a later time, to receive a written message instead, or in the alternative to hold such conversations before treatment or on non-treatment days. Those requests were disregarded.

60. On many occasions Plaintiff was so exhausted that he fell asleep again while Defendant's administrative staff continued speaking to him.

61. Plaintiff has repeatedly requested over the past 3 years in writing that Defendant communicate with him in writing rather than by telephone for various issues, and stated that the request was based on cognitive difficulties he experiences during and after treatment.

62. Defendant received that request. Defendant did not deny it, did not engage in any interactive or cooperative dialogue regarding it, and did not implement it.

63. Defendant thereby failed to engage in the interactive process and failed to accommodate Plaintiff's requests.

## G. <u>The August 2026 Written Requests and Defendant's Telephone Call</u>

64. On August 3, 2026 at 4:55 p.m., Plaintiff emailed Rachel Jagdeo, copying Patrick Acosta, J.G. Bhat, M.D. [ADMS], and Scott R. Green of Goldberg Segalla, asking: "Can

someone please clarify **in writing** who is getting billed as the payor for the actual dialysis service and who is getting billed for physician's services?" (emphasis added). See Exhibit G.

65. On August 4, 2026 at 1:27 p.m., having received no response, Plaintiff emailed again — expanding the distribution to include Steven Sotero [ADMS], Jacqueline Ortiz [ADMS], Shakuntala Sukhram [ADMS], and John Bulatao — describing the successive statements and asking, "Can someone investigate and respond?"

66. On August 6, 2026 at 11:51 a.m., John Bulatao responded to the thread in its entirety by stating that Plaintiff could call a named individual, and providing a telephone number.

67. Plaintiff did not call.

68. At 12:22 p.m. on August 6, 2026, a vehicle was dispatched to transport Plaintiff home from the facility following his dialysis treatment. The vehicle arrived at approximately 12:27 p.m.

69. At 12:34 p.m. on August 6, 2026 — seven minutes after Plaintiff entered the vehicle, and twelve minutes after his departure from the facility was recorded — Plaintiff received an incoming telephone call from the number printed on Defendant's billing statements. The call lasted eleven minutes. See Exhibit H.

70. Plaintiff was suffering a post-treatment headache during the call and was required to process an extended explanation of Medicare Advantage adjudication, secondary-payer coordination, and coinsurance allocation while in transit and symptomatic.

## H. The Pattern of Refusal

71. Defendant's refusal to honor Plaintiff's written-communication request is not isolated. On multiple separate occasions, four different members of Defendant's staff responded to a written request from Plaintiff with a non-written or non-responsive alternative some examples are:

a. Plaintiff asked for an email; Defendant placed a telephone call.

b. Plaintiff asked to discuss the Patient Advisory Committee meeting in writing; Defendant sent a staff member to Plaintiff's dialysis chair to discuss it orally during treatment.

c. Plaintiff asked to discuss hospice with someone; Defendant provided a printout generated by a large language model.

d. Plaintiff asked JaVita Banks [ADMS] for a copy of the Letter of Medical Necessity supporting his travel to Charleston, West Virginia for kidney transplant evaluation — a letter authored by ADMS staff or contractors; Ms. Banks directed him to telephone Medical Answering Services and request it from them.

## I. The Patient Advisory Committee Notices

72. Defendant posted notices at the facility, in English and Spanish, announcing: "OUR PAC MEETING WILL BE HELD ON: JULY 28, AND JULY 29 — TIME: ALL DAY — ALL PATIENTS AND FAMILIES ARE WELCOME."

73. No meeting was held. Instead, Defendant's staff approached patients individually at their dialysis chairs, while those patients were needled and connected to dialysis machines, and canvassed them.

74. Because the notices stated no start time and no meeting occurred, no family member could have attended as invited.

75. Canvassing patients at their chairs during treatment also disregarded the right of every such patient to be treated with consideration, respect and dignity including privacy in treatment. Patients' Bill of Rights for Diagnostic & Treatment Centers (Clinics), No. 2.

**J. <u>ADMS's Business</u>**

76. ADMS's website states: "Each chronic dialysis center contracts with ADMS for administrative and operational support activities, excluding those restricted by Federal, State and Local laws. ADMS recruits center staff, **performs billing and collections,** carries out purchasing and managed care contracting, develops operating procedures and systems for all sites, and carries out all business development, finance, accounting and corporate functions." (emphasis added). See Exhibit B.

77. ADMS holds no Article 28 operating certificate and is barred by New York law from exercising medical direction over the facilities it manages.

78. ADMS advertises a network of thirteen clinics. Those clinics operate under at least eight distinct operating certificates issued to at least eight distinct licensed operators, including Newtown Dialysis Center, Inc. (7003247R); Ridgewood Dialysis Center, Inc. (7003241R); Central Brooklyn Dialysis Center, LLC (7001118R); Park Slope Dialysis Management LLC (7001139R); New York Renal Associates, Inc. (7000250R); East End

Dialysis Management, LLC (5155204R); New Hyde Park Dialysis Center LLC (2912200R); and West Nassau Dialysis Center Inc. (2910200R).

79. ADMS has publicly described West Nassau Dialysis Center, New Hyde Park Dialysis Center, Central Brooklyn Dialysis Center, and East End Dialysis Center as **joint ventures**.

80. On information and belief one or more of the licensed operators for whom ADMS performs billing and collections is not related to ADMS by common ownership and is not affiliated with ADMS by corporate control.

81. ADMS regularly collects, and attempts to collect, debts owed or due to entities other than itself, including debts owed to Ridgewood Dialysis Center, Inc.

82. In the alternative, ADMS's functions are uniformly revenue functions. It is statutorily barred from clinical direction; the licensed operators deliver patient care under their own certificates. Subtracting the clinical function, what remains of ADMS's business is billing, collections, purchasing, managed care contracting, finance, and accounting. The collection of debts is therefore ADMS's dominant, and not an incidental, objective.

**K. The Legal Standards Governing Defendant's Conduct**

83. Plaintiff does not assert a private right of action under any of the provisions described in this section. He pleads them because they establish the substantive standards by which the lawfulness of Defendant's conduct is measured, and because the Fair Debt Collection Practices Act prohibits collecting an amount that is not "permitted by law," 15 U.S.C. § 1692f(1), and prohibits taking or threatening action that "cannot legally be taken," id. §

1692e(5). Provisions that make conduct unlawful supply the content of those prohibitions whether or not they are independently enforceable by a private plaintiff.

84. **New York Medicaid program regulations.** 18 N.Y.C.R.R. Part 504 sets the terms of provider enrollment, and 18 N.Y.C.R.R. § 515.2 defines the unacceptable practices described above. These regulations are enforced by the Department of Health and the Office of the Medicaid Inspector General through administrative sanction and recovery, and Plaintiff asserts no private right of action under them. They are pleaded because they establish that the amounts Defendant demanded were not amounts the enrolled provider — or its collecting agent — was permitted by law to collect.

85. **New York General Business Law Article 29-H.** Section 601 provides that no principal creditor "or his agent" shall, among other things, "[k]nowingly collect, attempt to collect, or assert a right to any collection fee, attorney's fee, court cost or expense unless such changes are justly due and legally chargeable against the debtor," § 601(1)(2); or "[c]laim, or attempt or threaten to enforce a right with knowledge or reason to know that the right does not exist," § 601(8). ADMS is the agent of the principal creditor within the meaning of the article.

86. Article 29-H is enforced by the Attorney General and by criminal penalty. N.Y. Gen. Bus. Law § 602. Plaintiff acknowledges that it affords no private right of action and asserts none. He relies on § 601 solely as a source of the legal standard governing whether the amounts Defendant demanded were "permitted by law" and whether the actions Defendant took were actions it could "legally" take.

87. **The Conditions for Coverage.** 42 C.F.R. § 494.70(a) confers on dialysis patients the rights described above, including the right to receive information in a way the patient can

understand and to be informed regarding charges. Plaintiff acknowledges that courts have generally held that the Conditions for Coverage do not create a private right of action enforceable under 42 U.S.C. § 1983 or otherwise, and asserts no such claim here. The regulation is pleaded because it defines the obligations a Medicare-certified dialysis operation owes its patients, and because conduct that violates it is not conduct the actor may "legally" undertake within the meaning of § 1692e(5).

88. **The Patients' Bill of Rights.** The rights described in this Complaint, including the right to a written response within thirty days, are likewise pleaded as standards rather than as independent causes of action.

## CAUSES OF ACTION

### COUNT I — Fair Debt Collection Practices Act, 15 U.S.C. § 1692f(1)

89. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

90. The amounts Defendant demanded are "debts" within the meaning of 15 U.S.C. § 1692a(5), being obligations of a natural person arising from a transaction for services obtained primarily for personal, family, or household purposes.

91. ADMS is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6) because it regularly collects, directly or indirectly, debts owed or due another — as it states on its own website and as it demonstrated in the August 6, 2026 telephone call.

92. In the alternative, ADMS is a "debt collector" because the principal purpose of its business is the collection of debts. *See Barbato v. Greystone All., LLC*, 916 F.3d 260, 267 (3d Cir. 2019); *McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089, 1094 (9th Cir. 2020); *Reygadas v. DNF Assocs., LLC*, 982 F.3d 1119 (8th Cir. 2020). The "principal purpose"

definition contains no limitation as to whom the debt is owed, and sweeps more broadly than the "regularly collects" definition. *Tepper v. Amos Fin., LLC*, 898 F.3d 364, 370 (3d Cir. 2018).

93. Section 1692f(1) prohibits the collection of "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

94. The amounts demanded were not permitted by law. Defendant represented to Plaintiff that his Medicaid coverage had been reinstated and was active, continued to provide services to him on that basis without any prior mutual agreement that he would receive those services as a private-pay patient, and thereafter sought to shift to Plaintiff the financial consequence of Defendant's erroneous eligibility determination and/or failure to verify eligibility through the Medicaid eligibility-verification system. New York Medicaid rules and official directives place that risk upon the participating provider and prohibit the provider from retroactively converting such services into a personal obligation of the patient.

95. ADMS demanded those amounts notwithstanding the April 9, 2026 written representation of its own staff that Plaintiff's Medicaid coverage was active.

96. The amounts are further not permitted by law because New York General Business Law § 601 forbids a principal creditor or its agent from asserting a right to payment with knowledge or reason to know that the right does not exist, and from making false or misleading representations concerning the character or amount of a debt; and because 18 N.Y.C.R.R. § 515.2(b)(8) and (b)(9) designate the seeking of payment in addition to the

amount payable under the Medicaid program, and the deceiving or misleading of a Medicaid client, unacceptable practices under the medical assistance program.

97. Section 1692f separately prohibits the use of "unfair or unconscionable means to collect or attempt to collect any debt." Defendant's means were unfair: they demanded payment for services they had furnished after representing to Plaintiff that his Medicaid was active and without obtaining a private-pay agreement beforehand.; doing so after its own staff had told him in writing that his coverage was active; it pursued the demand by telephoning him minutes after a dialysis treatment despite documented requests that it communicate in writing; and it told him it was legally required to bill him when it was not, and tried to get him to get Medicaid to pay the bill when they knew that at least for their April billing that was their burden. ADMS has a longstanding pattern of trying to shift their burdens placed on them by federal and state law onto patients, many of whom are already deeply overwhelmed by terminal illness, may suffer from mental illness, or lack both the necessary energy and sophistication to navigate matters that the Code of Federal Regulations, NY DOH regulations place on them.

**COUNT II — Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(2)(A)**

98. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

99. Section 1692e(2)(A) prohibits the false representation of "the character, amount, or legal status of any debt."

100. Defendant represented that Plaintiff personally owed $1,465.02 for the April 2026 service period, and characterized the entire period as "SELF PAY – All."

101. That representation misstated the character, amount, and legal status of the obligation.

**COUNT III — Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(5)**

102. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

103. Section 1692e(5) prohibits "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken," and reaches the taking of such action as well as the threat of it.

104. Defendant's representative stated that Defendant was "legally obligated" to bill Plaintiff. That statement was false.

105. Defendant further took action it could not legally take. It demanded and continues to demand payment of amounts that, if Plaintiff was a Medicaid beneficiary on the dates of service, the enrolled provider was obligated to seek from the Medicaid program rather than from him, 18 N.Y.C.R.R. § 504.3(c), and the seeking of which New York designates an unacceptable practice constituting fraud or abuse, id. § 515.2(b)(8), (b)(9). It further asserted a right to payment with knowledge or reason to know that the right did not exist, conduct New York General Business Law § 601 declares unlawful.

**COUNT IV — Fair Debt Collection Practices Act, 15 U.S.C. § 1692g(a)**

106. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

107. Section 1692g(a) provides that within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the required information was contained in the initial communication, send the consumer a written notice containing the amount of the debt; the name of the creditor to whom the debt is owed; a statement that unless the consumer disputes the validity of the debt within thirty days it will be assumed valid; a statement that if the consumer notifies the debt collector in writing within that period that the debt is disputed, the debt collector will

obtain verification and mail it to the consumer; and a statement that upon written request within that period the debt collector will provide the name and address of the original creditor if different from the current creditor.

108. The June 30, 2026 statement was ADMS's initial communication with Plaintiff in connection with the collection of the debt at issue.

109. That statement did not contain the information required by § 1692g(a), and ADMS sent no notice containing that information within five days thereafter or at any time since.

110. ADMS thereby deprived Plaintiff of the thirty-day validation period the statute guarantees — a deprivation of particular consequence here, where the debt is disputed and where verification would have required ADMS to confront its own staff's written representation that Plaintiff's Medicaid coverage was active.

**COUNT V — Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(11)**

111. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

112. Section 1692e(11) prohibits a debt collector from failing to disclose, in its initial communication with a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and from failing to disclose in subsequent communications that the communication is from a debt collector.

113. ADMS made no such disclosure in the June 30, 2026 statement, in any subsequent statement, or in the August 6, 2026 telephone call.

**COUNT VI — Fair Debt Collection Practices Act, 15 U.S.C. § 1692c(a)(1)**

114. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

115. Section 1692c(a)(1) provides that a debt collector may not communicate with a consumer in connection with the collection of any debt "at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer."

116. Plaintiff notified Defendant, in writing and repeatedly, that telephone communication was difficult for him by reason of his medical conditions, and that communications during and immediately following dialysis treatment were particularly so. He asked that Defendant respond in writing instead, and in the alternative that any conversation occur before treatment or on a non-treatment day.

117. Defendant therefore knew, and in any event should have known, that a telephone call placed to Plaintiff immediately following a dialysis treatment was inconvenient to him within the meaning of § 1692c(a)(1).

118. Defendant nonetheless telephoned Plaintiff at 12:34 p.m. on August 6, 2026 — twelve minutes after his treatment ended, while he was in a vehicle in transit — and kept him on the telephone for eleven minutes discussing the debt.

119. That call followed by forty-three minutes an email in which Defendant, responding to Plaintiff's second written request for a written answer, supplied a telephone number instead.

120. Regulation F provides that a debt collector must not communicate with a consumer through a medium of communication if the consumer has requested that the debt collector not use that medium. 12 C.F.R. § 1006.14(h)

**COUNT VII — Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**

121. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

122. Defendant receives federal financial assistance, including Medicare and Medicaid reimbursement paid on account of services rendered at the facilities it manages and billed by Defendant.

123. Plaintiff is an individual with a disability who is otherwise qualified to receive Defendant's services.

124. Plaintiff requested reasonable modifications — communication in writing rather than by telephone, and administrative conversations held outside of treatment — that would have imposed no cost and no administrative burden on Defendant.

125. Defendant failed to provide those modifications, failed to engage in any interactive process, and repeatedly directed Plaintiff to telephonic and in-treatment oral communication notwithstanding his documented requests.

126. The principal modification Plaintiff sought — a written response to his inquiries and complaints — is one Defendant is separately obligated to provide to any patient who requests it, within thirty days. Providing it to Plaintiff would have required Defendant to do nothing it was not already required to do.

127. Federal regulations require dialysis facilities to ensure that patients receive information in a manner they can understand. *See* 42 C.F.R. § 494.70.

**COUNT VIII — Americans with Disabilities Act, Title III, 42 U.S.C. § 12181 *et seq.***

128. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

129. Defendant owns, leases, or operates a place of public accommodation — the professional office of a health care provider. 42 U.S.C. § 12181(7)(F). Defendant operates the facility at which Plaintiff receives treatment within the meaning of that provision, in that it

recruits and employs the facility's staff, develops its operating procedures and systems, and carries out its business, finance, and administrative functions.

130. Defendant failed to make reasonable modifications in policies, practices, or procedures necessary to afford Plaintiff full and equal enjoyment of its services, and failed to furnish appropriate auxiliary aids and services to ensure effective communication. 42 U.S.C. § 12182(b)(2)(A)(ii)–(iii).

131. Plaintiff continues to receive treatment at the facility Defendant manages and remains subject to Defendant's practices. Injunctive relief is therefore appropriate.

**COUNT IX — New York State Human Rights Law, N.Y. Exec. Law § 296(2)**

132. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

133. The facility Defendant operates is a place of public accommodation within the meaning of N.Y. Exec. Law § 292(9).

134. Plaintiff has a disability within the meaning of N.Y. Exec. Law § 292(21).

135. N.Y. Exec. Law § 296(2)(c)(i) requires the provision of reasonable accommodations to persons with disabilities in places of public accommodation.

136. Defendant denied Plaintiff the reasonable accommodations he requested — written communication in place of telephonic communication, and administrative conversations conducted outside of treatment — and failed to engage in any good-faith interactive process.

137. The requested accommodations were available at no cost and would have imposed no undue hardship on Defendant. Defendant is independently obligated to provide a written

response to any patient who requests one within thirty days, and thus already possesses the capacity to communicate with Plaintiff in the manner he requested.

138. As amended in 2019, the State Human Rights Law is to be construed liberally to accomplish its remedial purposes, regardless of how comparable federal civil rights laws have been construed. N.Y. Exec. Law § 300.

**COUNT X — New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(4), (15), (28)**

139. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

140. The facility Defendant operates is a place or provider of public accommodation within the meaning of N.Y.C. Admin. Code § 8-102.

141. Section 8-107(4) makes it unlawful for a provider of public accommodation to withhold from or deny to any person, because of disability, the full and equal enjoyment of its accommodations, advantages, facilities, or privileges.

142. Section 8-107(15) requires the provision of reasonable accommodation to persons with disabilities, and places on the covered entity the burden of proving as an affirmative defense that no accommodation would have enabled the person to enjoy the accommodations in question.

143. Section 8-107(28) requires a covered entity to engage in a cooperative dialogue with a person who has requested an accommodation, and to provide that person a written final determination identifying any accommodation granted or denied. Defendant did neither.

144. Defendant denied Plaintiff's repeated accommodation requests over a period of approximately three years, and on August 6, 2026 telephoned Plaintiff twelve minutes after he left treatment notwithstanding those requests.

145. Defendant cannot characterize the requested accommodation as a mere preference or as an undue hardship. The written response Plaintiff requested is a service Defendant is independently obligated to furnish to every patient, disabled or not, upon request and within thirty days. Defendant therefore already maintains — or is required by law to maintain — the capacity to respond in writing, and the marginal cost of extending that same service to Plaintiff is zero. An entity that declines to provide what it is already obligated to provide cannot carry its burden of proving that no accommodation would have enabled Plaintiff the full and equal enjoyment of its services.

146. The New York City Human Rights Law must be construed independently of, and more liberally than, its federal and state counterparts. N.Y.C. Admin. Code § 8-130.

**COUNT XI — New York General Business Law § 349**

147. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

148. Defendant's posted Patient Advisory Committee notices were consumer-oriented: they were addressed to all patients and families, posted in common areas, and published in two languages.

149. The notices were materially misleading. They announced a "meeting" that "all patients and families are welcome" to attend, with no start time, when in fact no meeting occurred and Defendant instead canvassed patients individually while those patients were undergoing dialysis and unable to leave.

150. Plaintiff was injured thereby because he was deprived of the benefit of being able to hear and learn of other patients concerns and opportunity to exchange ideas with those patients which is the purpose of those meetings. Moreover, to the best of the Plaintiff's knowledge these PAC ( Patient Advocacy Committee) meetings had no committee and ADMS just threw something together to create the appearance of compliance with ESRD network rules requiring these meetings.

**COUNT XII — New York General Business Law § 350**

151. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

152. The posted notices constitute advertising within the meaning of GBL § 350.

153. The notices were false and misleading in a material respect, and Plaintiff relied on them to his detriment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that the amounts demanded for dates of service on which Plaintiff was a Medicaid beneficiary are not lawfully owed;

B. Enjoin Defendant from further attempts to collect those amounts from Plaintiff;

C. Order Defendant to submit the corresponding claims to the New York Medicaid program;

D. Enjoin Defendant to communicate with Plaintiff in writing regarding administrative, billing, and non-emergent clinical matters, and to refrain from initiating administrative conversations with Plaintiff during

treatment; Order Defendant to establish a true Patient Advocacy Committee and hold such meetings in strict compliance with ESRD Network Rules.

E. Award statutory damages under 15 U.S.C. § 1692k(a)(2)(A);

F. Award actual damages under 15 U.S.C. § 1692k(a)(1);

G. Award compensatory damages under 29 U.S.C. § 794a, N.Y. Exec. Law § 297(9), N.Y.C. Admin. Code § 8-502(a), and N.Y. Gen. Bus. Law §§ 349(h) and 350-e;

H. Award punitive damages under N.Y.C. Admin. Code § 8-502(a);

I. Award costs under 15 U.S.C. § 1692k(a)(3), 29 U.S.C. § 794a(b), and N.Y.C. Admin. Code § 8-502(g);

J. Award such other relief as the Court deems just.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Dated: August 14, 2026
New York, New York

/s/Jason Wimberly
*Plaintiff Pro Se*
231 East 117th Street, Apt. 5D
New York, NY 10035
jasonwimberly7@gmail.com